**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 3:06CV00176 JLH |
| v. | ) ) | |
| SOUTHWESTERN BELL TELEPHONE, L.P. D/B/A  AT&T SOUTHWEST AND SBC COMMUNICATIONS | ) ) ) ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Equal Employment Opportunity Commission, (the Commission) by and through

undersigned counsel, submits Plaintiff's Brief in Support of its response to Defendant's Motion

for Summary Judgment and states as follows.

Plaintiff filed its complaint on September 28, 2006, alleging that Joe Gonzalez and Glenn

Owen were denied a reasonable accommodation of their sincerely held religious beliefs and

subjected to discharge in violation of Title VII of the Civil Rights Act of 1964, as amended.

Defendant filed its Answer on or about November 30, 2006.   On August 16, 2007, Defendant

filed a Motion for Summary Judgment, a brief, and a Statement of Undisputed Material Facts.

Plaintiff sought an extension of time to respond to Defendant's Motion for Summary Judgment.

The Court granted the motion for extension of time, and Plaintiff's response is due on or before

September 14, 2007.    The jury trial of this matter is set for October 15, 2007.

## Summary of Facts

Glenn Owen and Joe Gonzalez worked out of Defendant's Jonesboro, Arkansas facility as Customer Service Technicians (CSTs).   In 2005, Defendant had 14 CSTs in its Jonesboro facility and three working out of its Newport facility.   (Ex. 14).   The Newport CSTs also worked in Jonesboro.  (Ex. 4, pp. 60-61).

Glenn Owen and Jose Gonzalez are brothers-in-law and their allegations are closely connected.   Mr. Owen was hired by Defendant in August of 1999 as a Customer Service Technician (CST).  (Ex. 3, Owen depo., pp. 21-23).  CSTs install, test, and maintain telephone equipment and wiring.   Mr. Gonzalez was hired in March of 1997 to work as a Customer Representative and was later promoted to a CST position.  (Ex. 2, Gonzalez depo., p. 30).

Both Mr. Owen and Mr. Gonzalez contend that in January of 2005 they made a written request to Jacob Garrett, manager of installation and repair for Defendant, for one day of leave to attend a Jehovah's Witness convention in Little Rock that was scheduled for Friday July 15 to Sunday July 17, 2005.  (Ex. 2, Gonzalez depo., pp. 51-52 and Ex. 3, Owen depo., p.28).  Both contend that they have a sincerely held religious belief that they must attend the Jehovah's Witness convention each year.  (Ex. 2, pp. 99-100 and Ex. 3, pp. 47-49).

The convention is centered around the teaching of religious doctrine.   Their entire congregation attends the same convention.   Both Mr. Owen and Mr. Gonzalez are leaders in their congregation.   (Ex. 2, pp. 99-100 and Ex. 3, pp. 47-49).   Mr. Owen is a ministerial servant and he learns about his responsibilities to his congregation at the convention and about Biblical teachings. (Ex. 3, pp. 48-49).  Mr. Gonzalez is an elder in the congregation and he organizes door to door activities for his congregation.  On average Mr. Gonzalez spends 10 to 15 hours of each week going door-to-door witnessing about his religious faith.  (Ex. 2, pp. 20-22).    Mr.

Gonzalez learns about his duties and responsibilities at the convention and about Biblical

teachings.  (Ex. 2, pp. 98-100).

Orlester Manning, is the Presiding Overseer and an elder in the congregation that Mr.

Owen and Mr. Gonzalez attend.    Mr. Manning stated that failing to attend the convention

"would indicate a weakness in your faith if a person chose to stay with the job.  For example, if,

as like Joe [Gonzalez] as an elder, you know, it would reflect on whether or not he could

continue to serve as an elder…."  (Ex.1, Manning depo., p. 21).    Mr. Manning described that

working at the convention is a privilege – "it's sort of like with Jesus, when he washed the feet of

the apostles, it was a privilege as for him to do that.  We view as a privilege to serve and assist

our brothers there at the conventions and to serve that interests."  (Ex.1, pp. 28-29).

Joe Gonzalez stated in his deposition that the obligation to attend the convention is rooted

in scripture.

> "[W]e encourage people to do is to do what Hebrews 10:24 and 25 says, do not neglect
> the gathering yourselves together.  Do not neglect the meetings, some English
> translations put it that way.  You view that as one of the meetings so as an elder, clearly
> I'm going to be among many who get up and encourage people not to neglect meetings.
> To do everything in their power not only to attend a convention, but to follow what we
> call theocratic order.  And that is if you're assigned to go this one, do everything that is
> reasonably possible to attend that one because there's a lot of practical value to."  (Ex. 2,
> Gonzalez depo., pp. 99-100).[1]

Mr. Gonzalez did not miss a convention during his employment with Defendant, in fact he has

not missed a convention since he was baptized.  (Ex. 2, p. 41)    Mr. Gonzalez was baptized on

August 10, 1984. (Ex. 2, p. 19).

Glenn Owen also has not missed a convention since he became a Jehovah's Witness in

1997.  (Ex. 3, Owen depo., p. 22).    Mr. Owen testified in his deposition that he is a ministerial

---

[1] And let us consider one another to provoke unto love and to good works:  Not forsaking the assembling of
ourselves together, as the manner of some is; but exhorting one another: and so much the more, as ye see the day
approaching.  Hebrews 10:24-25. (King  James).

servant and that he had duties at the convention.   "We have certain assignments that we take care of at our convention, and we are expected to carry out those duties."  (Ex. 3, p. 47/line 25 through p. 48/line 2).   Mr. Owen said that he worked as an attendant at the convention.  (Ex. 3, pp.47-48).   To serve as an attendant at the Jehovah's Witness convention you must meet "certain qualifications from the Bible that other people have not met."   (Ex. 3, p. 49/lines 7-8).

Prior to 2005, Mr. Owen and Mr. Gonzalez had always been able to take leave to attend the convention.  (Ex. 3, pp. 22-27).     They would learn about the date and location of the convention at the first worship service in January.  (Ex. 3, p. 23).  The conventions are always during the summer.  After they learned of the date of the convention they would submit a written request for leave for both Friday and Saturday.   Sundays are normally not work days.  In previous years, before Mr. Garrett was their supervisor, they were usually granted leave within a day or so of requesting the leave.  (Ex. 3, pp. 22-27).

Both Mr. Owen and Mr. Gonzalez renewed their requests to Mr. Garrett for the leave to attend the 2005 convention on several occasions.  (Ex. 2, pp. 50-62 and Ex. 3, pp. 28-31).   Mr. Garrett refused to give them leave.  In May of 2005, Glenn Owen made his third written request to Mr. Garrett to attend the religious convention.   Mr. Garrett said he'd have to look at the load before approving leave for the July Jehovah's Witness convention, but he immediately granted the leave request to attend the rock concert which was two weeks away.     Mr. Garrett also allowed Mr. Owen to move his day off to attend the rock concert.  (Ex. 3, Owen depo., p. 31; Ex. 4, Garrett depo., p. 38; and Ex. 5).  Mr. Owen was allowed to take a SN day (day off) on Thursday, June 9; and vacation days on Friday, June 10 and Saturday, June 11, 2005 to attend a rock concert.   (Ex. 5 and Ex. 4, p. 38).

Mr. Owen and Mr. Gonzalez were able to swap with co-workers to be off on Saturday, July 16.  They were not scheduled to work on Sunday, July 17.   Mr. Owen and Mr. Gonzales needed only one day of leave to attend the religious convention – July 15, 2005.  Both men continued to ask for the time off until the last minute.   Mr. Owen and Mr. Gonzalez reminded Mr. Garrett that the convention was a very important event for them and that he was requesting a religious accommodation.  (Ex. 2, p. 69 and Ex. 3, p. 56).  Mr. Gonzalez and Mr. Owen proposed that they could work the Sunday before and then take Friday as SN (a day off).  (Ex. 2, 70-71 and Ex. 3, pp. 39-40).   On the afternoon of July 14, 2005, Mr. Garrett told both Mr. Owen and Mr. Gonzalez that they could not be off due to the heavy workload.  (Ex. 4, pp. 28-29).   Mr. Gonzalez informed Mr. Garrett that they were not going to be at work on July 15 and that they were attending the convention.   (Ex. 2, p. 91)  They did not report to work on Friday, July 15, 2005. On July 18, 2005 they were suspended and they were discharged on August 2, 2005.  (Ex. 17 and Ex. 20).

Overtime is a daily occurrence for CSTs in Jonesboro.   (Ex. 7, Binns depo., p. 22).    It is part of the customer service technician's job description to work overtime.  (Ex. 6, Olea depo., p. 32).    An overtime report from Defendant for July 2005 showed that 987.56 overtime hours were worked in July of 2005 and for the period from January 2005 through July 2005 a total of 7,088.68 hours of overtime was worked by CSTs working in Jonesboro.  (Ex. 15, Overtime Paid Report).    According to Defendant's records, Mr. Gonzalez worked over 240 hours of overtime from January through July of 2005.  (Ex. 15).  Mr. Gonzalez's last day to work was July 14, 2005 and he still worked 16 hours of overtime in the month of July 2005.  (Ex. 15).    According to Defendant's records, Mr. Owen worked over 468 hours of overtime from January through July

of 2005.   Mr. Owen's last day at work was also July 14, 2005 and he still worked 21.5 hours of overtime in the month of July 2005.   (Ex. 15).

According to Defendant, CSTs were paid $1,103.50 per week ($57,382 in regular pay for 52 weeks).   Mr. Owen was paid over $90,000 in 2004 by Defendant due to the large amount of overtime he worked.     Mr. Gonzalez was paid over $82,000 in 2004 by Defendant due to the large amount of overtime he worked.  (Ex. 16, W-2 forms of Owen and Gonzalez).     From January 1, 2005 through July 14, 2005, Mr. Gonzalez was paid over $40,000 by Defendant.    For the same time period Mr. Owen was paid over $47,000.  (Ex. 16).

Glenn Owen filed a charge of discrimination with the Little Rock Area Office of the EEOC on August 26, 2005, alleging that he was denied a religious accommodation to attend a religious observance and that he was discharged because of his religion -- Jehovah's Witness. (Ex. 17, Charge No. 251-2005-02506).  The Commission conducted an investigation and issued a letter of determination on August 16, 2006, finding probable cause to believe that Mr. Owen had been denied a reasonable accommodation and discharged because of his religious beliefs. (Ex. 18).     The Commission engaged in the conciliation process.   A conciliation failure letter was forwarded to Defendant on September 19, 2006.  (Ex. 19).

Joe Gonzalez filed a charge of discrimination with the Little Rock Area Office of the EEOC on September 13, 2005, alleging that he was denied a religious accommodation, placed on suspension, and terminated because of his religion -- Jehovah's Witness.   (Ex. 20, Charge No. 251-2005-02592).  The Commission conducted an investigation and issued a letter of determination on  August 16, 2006, finding probable cause to believe that Mr. Gonzalez had been denied a reasonable accommodation and discharged because of his religious beliefs.  (Ex.

21).   The Commission engaged in the conciliation process.   A conciliation failure letter was forwarded to Defendant on September 19, 2006.  (Ex. 22).

## Argument

## Summary Judgment Standard

Summary judgment is appropriate only when a review of the entire record establishes that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 106 S. Ct. 2548 (1986).

At the summary judgment stage, the Court is not to weigh the evidence or make findings as to credibility.  Rather, the Court simply views all the evidence in the light most favorable to the nonmovant and, after drawing all reasonable inferences in favor of the nonmovant, decides whether there is any genuine and material issue for trial.  Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505 (1986).  Put another way, summary judgment must be denied when the nonmoving party produces evidence that creates conflicts of material facts on issues for which it has the burden of proof.  When these conflicts of fact occur, they must be resolved by the fact finder.

The above cited standard has been recently applied and more fully explained by the United States Supreme Court in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed. 2d 105 (2000).  The Supreme Court stated as follows:

> The court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.  Lytle v. Household Mfg., Inc., 494 U.S. 545, 554-555 (1990); Liberty Lobby, Inc., supra at 254; Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, n. 6 (1962).  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.  Liberty Lobby, supra, at 255.  Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.  See Wright & Miller, 299.  That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is

uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.  Id., at 300.

The Eighth Circuit Court of Appeals has held that summary judgment should be used infrequently in employment discrimination cases.  Bassett v. City of Minneapolis, 211 F.3d 1097 (8th Cir. 2000); Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994), citing Johnson v. Minnesota Historical Society, 931 F.2d 1239, 1244 (8th Cir. 1991); Hillebrand v. M-Tron Indus., Inc., 827 F.2d 363, 364 (8th Cir. 1987), cert. denied, 488 U.S. 1004, 102 L. Ed. 2d 774, 109 S.Ct. 782 (1989).  Reasoning that discrimination cases most frequently rely on inferences rather than direct evidence, the Court stated that "summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant."  Crawford, 37 F.3d at 1341.  "Summary judgments should be sparingly used and then only in those rare instances where there is no dispute of fact and where there exists only one conclusion.  All the evidence must point one way and be susceptible of no reasonable inferences sustaining the position of the nonmoving party.'"  Davis v. Fleming Companies, Inc., 55 F.3d 1369, 1371 (8th Cir. 1995) (quoting Johnson v. Minnesota Historical Soc'y, 931 F.2d 1239, 1244 (8th Cir.1991)); see also Gill v. Reorganized Sch. Dist. R-6, 32 F.3d 376, 378 (8th Cir.1994) (reviewing summary judgment "with caution in employment discrimination cases . . . because intent is inevitably the central issue"); Keys v. Lutheran Family & Children's Servs. of Mo., 668 F.2d 356, 358 (8th Cir. 1981) (noting in retaliation case that "where motive, intent, and credibility are key factors summary judgment is generally inappropriate.")

Application of these legal standards to the facts in this case shows that genuine issues of material fact exist, and reasonable inferences must be drawn in favor of Plaintiff.  Because the record is replete with these questions of fact, the Commission respectfully requests that the Court deny Defendant's motion.

## **Religious Discrimination**

In order to establish a prima facie case of religious discrimination under 42 U.S.C. §§2000e-2(a)(1) & (j), a plaintiff must plead and prove that (1) he has a bona fide belief that compliance with an employment requirement is contrary to his religious faith; (2) he informed his employer about the conflict; and (3) he was discharged because of his refusal to comply with the employment requirement.   Brown v. General Motors Corp.,  601 F.2d 956, 959 (8th Cir. 1979).

The evidence supports that Mr. Gonzalez and Mr. Owen each had a sincerely held religious belief that required them to attend the religious convention.  (Ex. 2, pp. 97-102; Ex. 3, 22-25, 47-49; and Ex. 1, p. 21, 28-29).  There is no dispute that Mr. Gonzalez and Mr. Owen put Defendant on notice of the conflict between their religious beliefs and their work schedule. Marty Binns, I and R supervisor, testified in his deposition that Mr. Olea, Director of Installation and Repair for Arkansas and southwest Missouri was aware that Mr. Gonzalez and Mr. Owen were seeking time off to attend a religious observance.  (Ex. 7, p. 24).   The record is clear that both men were fired for attending the religious convention on July 15, 2005.  (Ex. 4, p. 49). Plaintiff has established a prima facie case of religious discrimination.

## **Reasonable Accommodation**

As is clear from the face of the statute, an employer must make reasonable accommodations, short of undue hardship, for the religious practice of his employees. Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 74 (1977).  In Ansonio Board of Education, et.al. v. Philbrook, 107 S.Ct. 367 (1986) the Supreme Court examined the legislative history of Title VII's prohibition on religious discrimination.

> To the extent it provides any indication of congressional intent, however, we think that the history supports our conclusion.  Senator Randolph, the sponsor of the amendment

that became §701(j), expressed his hope that accommodation would be made with "flexibility" and "a desire to achieve an adjustment."  118 Cong.Rec. 706 (1972). Consistent with these goals, courts have noted that "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion  and the exigencies of the employer's business."  <u>Brener v. Diagnositc Center Hospital</u>, 671 F.2d 141, 145-146 (5th Cir. 1982).  <u>See also</u> <u>American Postal Workers Union v. Postmaster General</u>, 781 F.2d 772, 777 (9th Cir. 1986).

<u>Philbrook</u> 479 U.S. at 69.

In the present case, Defendant was neither flexible nor cooperative in its approach to evaluating and responding to the request for a reasonable accommodation by Mr. Gonzalez and Mr. Owen.    Defendant never asked Mr. Owen and Mr. Gonzalez about their religious beliefs. (Ex. 4, pp. 30-31 and Ex. 8, p. 32).   Defendant never spoke with any church leaders about the need for an accommodation of the religious beliefs of Mr. Gonzalez and Mr. Owen.  (Ex. 4, pp. 30-31 and Ex. 8, p. 32)    Defendant did not meet its obligation to try to accommodate the religious beliefs of Mr. Gonzalez and Mr. Owen.  See <u>EEOC v. Ithaca Industries, Inc.</u>, 849 F.2d 116, 118 (4th Cir. 1988) (in finding that Defendant subjected plaintiff to religious discrimination, the court noted the "absolute lack of effort at accommodation by the employer.")

Mr. Owen and Mr. Gonzalez testified in their depositions that they requested leave for the religious convention beginning in January of 2005.   Mr. Gonzalez testified in his deposition that he made multiple requests and had conversations with Jacob Garrett about the convention prior to the week of July 3, 2005.  (Ex. 2, Gonzalez depo., pp. 51-62).  Mr. Owen also testified in his deposition that he made multiple requests to attend the convention and had discussions with Mr. Garrett prior to the week of July 3, 2005. (Ex. 3, Owen depo., pp. 28-31).    Mr. Garrett responded in a "wait and see" manner and this type of posture amounts to no reasonable accommodation at all.  <u>EEOC v. Arlington Transit Mix, Inc.</u>, 957 F.2d 219, 222 (6th Cir. 1991).

In <u>Sturgill v. UPS</u>, Civil No. 05-5106, 2006 WL 3147665 (W.D. Ark. Nov. 2, 2006)(slip

opinion)  the Court in denying Defendant's post-trial motions and upholding Plaintiff's jury

verdict found that an employer's failure to respond to multiple requests for a religious

accommodation and the eventual denial of the requests for accommodation without ever

discussing the requests with the employee are factors from which a jury could have reasonably

concluded that the employer acted with malice or reckless indifference to the employee's rights.[2]

<u>Id.</u>  at 3-4.

Mr. Garrett denies that multiple requests for leave to attend the religious convention were

made by Mr. Owen and Mr. Gonzalez.    (Ex. 4, Garrett depo., pp. 17-20).   Mr. Garrett testified

the first time he heard about Mr. Gonzalez and Mr. Owen needing to attend the religious

convention in July 15, 2005, was on June 30, 2005.  (Ex. 4, pp. 17-20).

Mr. Garrett testified that it was his understanding that he should take all requests for

religious accommodation to his supervisor, Phil Farley.  (Ex. 4, p. 14).   According to Mr.

Farley, he was not informed about the requests of Mr. Owen and Mr. Gonzalez for religious

accommodation until the morning of Thursday, July 14, 2005, the day before the religious

convention began.  (Ex. 8, pp. 20-21).   This directly contradicts the deposition testimony of Mr.

Olea who stated that he learned "early in the week of where the incident happened" from Mr.

Farley that Glenn Owen needed to be off work to attend a religious convention. (Ex. 6, Olea

depo., p. 15/line 25 through p. 16/line 7).    Mr. Olea said that early in the week Mr. Farley told

him that they could not accommodate Mr. Owen's and Mr. Gonzalez's request for an

accommodation.  (Ex. 6, pp. 15-17).     The issue of when and how often Mr. Owen and Mr.

Gonzalez asked for leave and when their requests were communicated to all of Defendant's

managers is full of material questions of fact.

---

[2] Attached as Plaintiff's Exhibit 23.

Defendant contends that only one CST can be on leave during the summer months.  The Commission contends that there were several occasions during the summer months when more than one CST was off work.   Joe Gonzalez testified in his deposition that he remembered two people being off at the same time and that there could also be two people off and one on SN (day off).   (Ex. 2 , Gonzalez depo., p. 44).   Customer service technicians have two SN days during the week.  The term SN means days not scheduled or days off.   (Ex.4, Garrett depo., p. 38). Defendant allowed employees off during the summer on short notice.  Glenn Owen was allowed by Jacob Garrett to attend a rock concert.  Mr. Owen submitted his request for leave to Mr. Garrett on May 23, 2005, and it was approved immediately.  (Ex. 3, Owen depo., p. 31;  Ex. 4, Garrett depo., pp.37-38; and Ex. 5, Owen Vacation Request dated May 23, 2005.)   On another occasion Jacob Garrett maneuvered the schedule to allow Rodney Vanhoover, another CST under Mr. Garrett's supervisor, to get off work during the summer to attend a golf tournament. (Ex. 2, pp. 81-82).

Mr. Gonzalez and Mr. Owen suggested to Mr. Garrett that they could work the Sunday before Friday, July 15 and then take Friday, July 15 as their day off or SN day.   (Ex. 2, pp. 70-71 and Ex. 3, pp. 39-40).   Mr. Garrett did not even tell Mr. Farley about this suggestion for a possible reasonable accommodation until July 15, 2005, after Mr. Owen and Mr. Gonzalez did not report to work.  (Ex. 8, p. 41).    Mr. Garrett made no effort to meet with Mr. Owen and Mr. Gonzalez to discuss their proposed accommodation and he did not even bother to tell his supervisor about the proposal.

Defendant cites TWA v. Hardison, 432 U.S. 63 (1977) in its brief to support its undue hardship argument.    In Hardison the Supreme Court recognized that, at a minimum, the employer was required to negotiate with the employee in an effort to reasonably accommodate

the employee's beliefs.   Id. At 75.     In Hardison, the employer "held several meetings with plaintiff at which it attempted to find a solution to plaintiff's problems," and "authorized the union steward to search for someone who would swap shifts," and "attempted without success to find Hardison another job."   Id. At 77.     In the present case, Defendant took no action to try to accommodate Mr. Gonzalez and Mr. Owen.    There were no negotiations and Defendant did not make contact with the union until after it had denied the requests for accommodation.   (Ex. 8, Farley depo., pp. 27-28).    Both men proposed working the Sunday before the convention so they could help lessen the workload and this recommendation was ignored.   (Ex. 2, pp. 70-71 and Ex.3, pp. 39-40; Ex. 8, p. 41).

## **Undue Hardship**

Once Plaintiff has established a prima facie case of religious discrimination the burden shifts to Defendant to show that accommodation of Mr. Gonzalez's and Mr. Owen's religious beliefs would result in an undue hardship.   Seaworth v. Pearson, 203 F.3d 1056, 1057 (8th Cir. 2000).   Defendant has failed to meet that burden.     There are material questions of fact regarding undue hardship that preclude summary judgment.

In the Brown case the Eighth Circuit found that the discharge of Mr. Brown violated Title VII's prohibition against religious discrimination.  Brown v. General Motors, 601 F.2d 956, 959 (8th Cir. 1979).  Mr. Brown requested the reasonable accommodation of being off to observe his Sabbath – from sunset Friday until sunset Saturday.   The Eighth Circuit held that the accommodation would not cost the employer anything and therefore was not an undue hardship. Id.

In Cook v. Chrysler Corp., 981 F.2d 336, 337-339 (8th Cir. 1992) the Eighth Circuit found that the employer would be subjected to more than a de minimus cost to provide a

reasonable accommodation when doing so would require hiring another employee, loss of efficiency, and to accommodate the employee the employer would be required to take steps inconsistent with its collective bargaining agreement.    The Eighth Circuit distinguished Mr. Cook's situation from the plaintiff in <u>Brown</u> because in <u>Brown</u> neither party contended the proposed reasonable accommodation would contravene a collective bargaining agreement.  <u>Cook</u> at 339.    There is no allegation in the present case that Defendant's collective bargaining agreement would be contravened by accommodating Mr. Owen and Mr. Gonzalez. "Although Defendant correctly states that an employer is not obligated to violate the terms of a collective bargaining agreement to accommodate an employee's religion, the burden remains on the employer to make an effort to resolve the conflict before terminating the employee." <u>EEOC v. Chemsico, Inc.</u>, 216 F.Supp.2d 940, 953 (E.D. Mo. 2002) <u>citing</u> <u>Cook v. Chrysler Corp.</u>, 981 F.2d 336 (8th Cir. 1996).

Unlike the <u>Cook</u> case, Defendant would not be required to hire another employee or suffer any loss of efficiency.  The current case does not require any hiring of new employees or any other extensive action on the part of the employer.    Mr. Owen and Mr. Gonzalez only needed one day off.    Defendant failed to make any effort to resolve the conflict between the religious obligations of Mr. Owen and Mr. Gonzalez and Defendant's refusal to grant leave before it terminated both men.    Defendant failed to meet the burden imposed upon it by Title VII of the Civil Rights Act of 1964, as amended.   <u>Chemsico</u>  216 F.Supp.2d at 953.

Mr. Owen and Mr. Gonzalez have a federally protected right to be free from discrimination based on their religious beliefs.  See 42 U.S.C. §§2000e-2(a).    Religion is defined as "all aspects of religious observance and practice, as well as belief."  See 42 U.S.C. §2000e(j).  According to Phillip Farley, Defendant treated their request for a reasonable

accommodation the same as any other vacation request. (Ex. 11).  Jacob Garret adjusted the work schedule to allow a CST off work to play in a golf tournament.  (Ex. 2, pp. 81-82).   There is no federally protected right to be off for non-religious reasons such as recreation.  "[W]e note that §2000e-2(a)(1) does not require an employer to reasonably accommodate the purely personal preferences of its employees."  Brown at 960.   Accommodating the religious beliefs of Mr. Owen and Mr. Gonzalez does not in effect discriminate against all employees who do not adhere to the same religion.  See Brown at 961.   The testimony and evidence cited by the Commission establishes that Defendant ignored the federally protected rights of Mr. Owen and Mr. Gonzalez to attend their religious observance and raises material questions of fact about Defendant's actions which caused Mr. Owen and Mr. Gonzalez to lose their jobs.

Defendant alleges that the undue hardship it suffered was paying overtime in the amount of $882.88.   The Commission asserts that there is a material question of fact as to the amount of overtime that was actually worked and the number of CSTs who worked on July 15, 2005. During the investigation of the charges of discrimination filed by Mr. Owen and Mr. Gonzalez, Defendant submitted a letter to the Commission dated February 28, 2006 letter.    In the letter Defendant identified eleven CSTs that worked overtime on July 15, 2005 and it estimated 30.50 hours of overtime worked.  (Ex. 13, Defendant's Feb. 28, 2006 letter, Bates## EEOC 0205-0208).   On May 4, 2006, Defendant sent another letter to Commission Investigator Lynda Fier. In the May 4, 2006 letter, Defendant stated that 12 CSTs worked on July 15, 2005 in Jonesboro and three more in nearby Newport.  (Ex. 14, Defendant's May 4, 2006 letter).  Defendant attached to its motion for summary judgment an affidavit signed on August 14, 2007 by Mr. Farley.  In his affidavit, Mr. Farley claims that there were ten Jonesboro CSTs who accumulated

37.75 hours of overtime.  (See Defendant's Ex. 4, p. 2)   The latest amount differs by over seven

hours from the amount of overtime claimed by Defendant in its Feb. 28, 2006 letter.  (Ex. 13).

        Defendant's calculation of overtime for July 15, 2005 is incorrect.    Even if we accept

Defendant's latest figure of 37.75 hours of overtime as the amount allegedly lost due to the

absence of Mr. Owen and Mr. Gonzalez, the total cost to Defendant would not be $882.88.

Defendant is claiming that all of the overtime hours should be calculated at double time rates and

that the absence of Mr. Owen and Mr. Gonzalez cost them 16 hours of double time.   Defendant

has not provided any financial records to support that allegation.

        If Mr. Owen and Mr. Gonzalez had worked 8 hours each on July 15, 2005 (a total of 16

hours) at the rate suggested by Defendant ($27.59) there would have still been 21.75 hours of

overtime paid to someone – either them or other employees.    Defendant can only argue that the

undue hardship is paying for 16 hours of overtime instead of 16 hours at the regular hourly rate.

The gross pay amount for 16 hours of double time overtime is $882.88. ($55.18/hour x 16

hours).   Sixteen hours at the regular rate is $441.44 ($27.59 x 16 hours).   If you subtract the

overtime rate figure ($882.88) from the regular rate figure ($441.44) you only have a difference

of $441.44 that Defendant allegedly had to pay because of the absence of Mr. Owen and Mr.

Gonzalez.   At the very most, if we accept of all of Defendant's figures as accurate, the absence

of Mr. Owen and Mr. Gonzalez only cost $441.44 or $220.72 each.    The Commission contends

that a one time cost of $220.72 for a company with substantial financial resources and the huge

workforce available to Defendant does not constitute an undue hardship.[3]

---

[3] When asked in his deposition about the overtime worked by the CSTs on July 15, 2005, Joe Gonzalez said that 30
hours of overtime was just another day on the job and most of his co-workers were glad to get the overtime.   (Ex. 2,
Gonzalez depo., p. 74).

## Overtime is a daily occurrence

Overtime is a daily occurrence for CSTs in Jonesboro.  (Ex. 7, Binns depo., p. 22).   It is part of the customer service technician's job description to work overtime.  (Ex. 6, Olea depo., p. 32).   An overtime report from Defendant for July 2005 showed that 987.56 overtime hours were worked in July of 2005 and for January 2005 through July 2005 a total of 7,088.68 hours of overtime was worked by CSTs working in Jonesboro.   (Ex. 15, Overtime Paid Report).  According to Defendant, CSTs were paid $1,103.50 per week ($57,382 in regular pay for 52 weeks).   Mr. Owen was paid over $90,000 in 2004 by Defendant due to the large amount of overtime he worked.     Mr. Gonzalez was paid over $82,000 in 2004 by Defendant due to the large amount of overtime he worked.  (Ex. 16, W-2 forms of Owen and Gonzalez).

Defendant is hard pressed to claim that  for a once a year event that 16 hours of overtime, 8 hours of overtime for each person seeking an accommodation, equals an undue hardship considering the thousands of hours of overtime that CSTs work each year.  Mr. Gonzalez worked over 240 hours and Mr. Owen worked over 468 hours of overtime from January through July of 2005. (Ex. 15).   During their last month of employment, July 2005, Mr. Gonzalez's  worked 16 hours of overtime and Mr. Owen's worked 21.5 hours of overtime.   (Ex. 15).

Defendant claims that there was an unusually high demand that justified the denial of leave for Mr. Owen and Mr. Gonzalez.    The Commission disputes how high the demand actually was on July 15, 2005.  Mr. Farley testified that he likes to start each day with an average of 3.5 to 4.5 jobs per CST.  (Ex. 8, Farley depo., p. 57).  Mr. Binns testified that as a manager you don't like to have over five jobs per technician.  (Ex. 7, Binns depo., p. 28)  Mr. Garrett testified that Defendant strives for an average of 4.95 jobs per technician.  (Ex. 4, Garrett depo., p. 41).  The Work Load Report prepared by Mr. Farley to demonstrate the level of the work load

shows that the job to technician ratio never exceeded 4.7 on July 15, 2005.  (Ex.12, Workload

Report).  This figure is well within the average that Defendant strives to achieve. (Ex. 4, Garrett

depo., p. 41).    In other words, the demand for July 15, 2005 was within acceptable limits.

### Defendant wanted to send a message to its employees

Defendant's reaction to the need for two long-term employees to attend a religious

observance was unreasonable and harsh.   Suffering the alleged undue hardship of $220.72 for

each employee who attended the religious conference is not Defendant's motivation for firing

Mr. Owen and Mr. Gonzalez.   Defendant's inexperienced supervisor, Jacob Garrett, made a

decision to ignore his obligation to reasonably accommodate Mr. Owen and Mr. Gonzalez.

Defendant chose to ignore the federally protected rights of its employees to attend religious

observances and decided to make an example of Mr. Owen and Mr. Gonzalez and characterize a

simple request to attend a religious observance as misconduct and insubordination.  (Ex. 11).

Mr. Farley sent emails to Cathy Jones, Employee Resource Manager after the suspension

of Mr. Owen and Mr. Gonzalez.  (Ex. 11, Cathy Jones emails, Bates ## 00216-00217).   In the

first email, Mr. Farley recommended discharge for both Mr. Owen and Mr. Gonzalez.

> "In my mind failure to act appropriately in relation to these employee's misconduct could
> have a negative impact on my field manager involved, compromise our credibility as a
> management team as a whole, and moreover set a precedence that would be difficult to
> control going forward more specific to requiring our people to follow work directives
> from their supervisors. … Conducting our business and meeting our commitments
> sometimes results in "inconvenience" to us all, this case is no different. … I feel we have
> no choice from a corporate standpoint except to hold these employees accountable
> therefore sending a strong signal to all that we are united in our desire to do what is right
> and support our line managers."  (Ex. 11, Bates #00216).

Mr. Farley sees Defendant's denial of the multiple requests for reasonable accommodation of

Mr. Owen and Mr. Gonzalez as an "inconvenience" and he wants to send these two long-term

employees a strong signal.   (Ex. 11).   He is not worried about the federally protected rights of

Mr. Owen and Mr. Gonzalez.   Mr. Farley is worried about how Defendant's actions are perceived by "represented forces" and how "not following through as recommended (termination) could adversely effect all our work groups residing under Mr. Taylor's organization." (Ex. 11, Bates #SBC00217).[4]   Mr. Farley's statement indicates the malicious nature of the terminations of Mr. Owen and Mr. Gonzalez and raises material questions of fact about Defendant's actual motivation behind the these terminations.

## Conclusion

Plaintiff has established its prima facie case of religious discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended.   Defendant made no effort to accommodate the religious beliefs of Mr. Owen and Mr. Gonzalez .  Defendant has failed to show that accommodation of Mr. Owen's and Mr. Gonzalez's religious beliefs would create an undue hardship.   Plaintiff contends that there are questions of material fact that preclude summary judgment on its claims.  Plaintiff moves this Court to deny Defendant motion of summary judgment.

WHEREFORE, the Plaintiff requests that Defendant's Motion for Summary Judgment be denied and for all other relief to which it is entitled.

**RONALD S. COOPER**
General Counsel

**JAMES LEE**
Deputy General Counsel

**GWENDOLYN YOUNG REAMS**
Associate General Counsel

**FAYE A. WILLIAMS**
Regional Attorney

---

[4] Vann Taylor is president of the network organization.   (Ex. 6, Olea depo., p. 108).

/s/ William A. Cash, Jr.
**WILLIAM A. CASH, JR.**
Supervisory Trial Attorney
Ark. Bar #88081

**EQUAL EMPLOYMENT OPPORTUNITY
  COMMISSION**
820 Louisiana St., Ste. 200
Little Rock, AR 72201
Telephone:  (501) 324-5539

/s/ Darin B. Tuggle
**DARIN B. TUGGLE**
Trial Attorney
NJ Bar No. 048621998

**EQUAL EMPLOYMENT OPPORTUNITY
  COMMISSION**
1407 Union Avenue, Suite 901
Memphis, Tennessee 38104
Telephone:     (901) 544-0133

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2007, a true and correct copy of the above and foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following:

Byron L. Freeland
Jeffrey L. Spillyards
MITCHELL, WILLIAMS, SELIG, GATES
  & WOODYARD, P.L.L.C. -- LR
425 West Capitol Avenue
Suite 1800
Little Rock, AR  72201


/s/ William A. Cash, Jr.
**WILLIAM A. CASH, JR.**
Supervisory Trial Attorney
Ark. Bar #88081
EQUAL EMPLOYMENT OPPORTUNITY
  COMMISSION
820 Louisiana St., Ste. 200
Little Rock, AR 72201
Telephone:  (501) 324-5539
Email: william.cash@eeoc.gov